Good morning, Your Honors. I'm Deborah Jaffe from Lasorda and Patton, and I'm representing the appellants, Edward and Jamie Walter. May it please the Court, the issue we have in this case is what constitutes a stock option exercise. In other words, what are the steps that an individual has to take to exercise options that he holds? What steps did Mr. Walter have to take to exercise the options he held in his employer, Primus? What this case is not is a case similar to Tuff, Ninth Circuit case, wherein the taxpayer or a taxpayer is arguing that the transfer of beneficial ownership occurred at some point after the exercise or on the occurrence of some event after the time of exercise. I think it's fair to say that appellant and appellee agree that the transfer of beneficial ownership did occur and does occur on the exercise of the option. Beneficial ownership, as I said, is important because that is the time on which income must be recognized by one who is exercising options under Section 83 of the Internal Revenue Code. Neither the Internal Revenue Code nor the regulations under Section 83 set forth any steps or any particular requirements for exercising an option. But in this case... Do you think the regulations are designed to give the taxpayer a range of dates to choose from so he can decide whatever date is going to be most favorable for tax purposes? No, I think they are designed to allow the parties, the employer and the employee, but most probably the employer, to choose a method by which the options can be exercised. And once that's down in writing, that is what has to be done. Frankly, I don't really understand what was discretionary past the point when your client on July 14 says, I'm exercising the option. Under the terms of the option plan, he had to make payment in full. Well, he had to make payment. The company can elect not to actually deliver if you don't pay. But that's true in any kind of stock transaction. You place an order, and if you don't pay, you're not going to get what you've ordered. But that order that you placed, if the brokerage house chooses to exercise its rights, it can go after you for the money. In some instances, when you look at options, you have to look at whether this is a payment as a condition precedent. And in this case, if you look through all the documents and the facts that happened in this case, the payment in the form that the documents required was a condition precedent to the completion of the option exercise. But it wasn't your client's option whether to exercise the condition. I mean, your client was committed at that point. The company might have opted, if he didn't pay, not to deliver. But your client was on the hook. Your client couldn't place the order and then three days later say, oops, never mind. He didn't place the order. He said, I'm going to exercise. So the stock option, he wasn't placing the order. Well, originally, he had a same-day and hold. Yes. Let's say he had kept its same-day sale. Yes. What would have happened on July 14th? July 14th, if he had kept its same-day sale, same-day sale, I'm assuming the stock would have been sold and Primus would have been paid. And that would have been... On July 14th. On July 14th. So that gets back to what Judge Clifton was talking about. It sort of gives the taxpayer the choice. I mean, that's really what you're arguing here. If you don't check same-day sale, but instead do exercise and hold, where there are various steps that have to take place, the taxpayer can pick the day which most benefits him or her based on a particular step within that process. Well, believe me, July 18th didn't benefit Mr. Walter, but... But July 14th would have very much benefited him. In fact, if he had taken same-day sale at the price he was allowed to buy, and then at the same-day sale sell, he would have made big money and Primus would have got their money, too. Right. But what he had the option of on July 14th, if he had exercised and sold, he had the option of paying in cash, or he had the option through a sale, or he had the option of providing the money himself. In either event, if he did exercise and sell, it would have met the terms of the option contract that his employer required that would have met the steps for completing the exercise of the option. The steps were not met. The fact is, there was no... I'm not sure, actually, that it would have. I mean, would the company have received the money by that time? Well... Closing usually takes place, a settlement in this context, takes place sometime actually after the place or the order or the execution of the, in this case, the sale, the immediate sale. The money actually changes hands a short time later. Well, you could argue that the company doesn't get the money, so it isn't obligated to recognize the option until it actually gets the money, under your argument. Well, there are... The company possibly could have accepted it, but there's plenty of evidence in the record that the company did not think that the option exercise had been completed at the time, on July, excuse me, on July 14th. And if you look at the... Well, as I understand it, all they felt like is that the money hadn't been exactly done. But the party's performance, in this instance, Primus had authorized payment by Section 7.5.3.i, where Primus designated Piper Jaffray as the authorized broker. Walter opened the account with Piper Jaffray. Walter used the Piper Jaffray form that appears to have created, to have been created to comply with 7.5.i.i.i. And then Primus treated the form from Walter as a completed option exercise. What else is there? Well, with respect, Primus did not authorize the method of payment under Section 7.5.3. When they issued, they had to, the option documents state that the option, or the plan administrator has to adopt a different method. I mean, originally, the plan provides that the only method of payment is cash, and that the option, the plan administrator can adopt certain limited methods. And when the options were granted, the plan administrator did adopt certain limited measures, and that was to allow payment in cash. It did not adopt this method of the cashless method of exercise. Only it didn't object to it or didn't reject the transaction because of it. Well, what happened was it sent back on July 17th, which is three days after when the IRS says the option exercise occurred, it sent back a notification to Mr. Walter and his firm to exercise. But at the same time, though, the stock option notice of exercise form itself has a stamp at the bottom which says trade done 7-14-00. Well, if you look also, though, if you look at the letter that actually authorized the issuance of the stock, it says the transaction date is July 18th. There wasn't a trade. There was just an issuance of the stock. So if you look, I think it's excerpt of the Record 17, that letter, which is the letter from Primus to the clearinghouse for the stock, people DWAC, states that the transaction date is July 18th. And until Primus sent that letter on July 18th, there were no other steps that it took to indicate that it considered itself obligated to issue the stock. Do you want to reserve any of the time left for rebuttal? Or go ahead and use it now. Your choice. I'd like to reserve one minute. Okay. Thank you. We'll hear from the Commissioner. Good morning, Your Honors. May it please the Court, I'm Ida Dale on behalf of the Commissioner. I think that it is an important concession that counsel for the appellants made that the, if Mr. Walter had not telephoned Piper Jaffray to change his instructions, and if the box marked checked, same day sale were permitted to go through, then Mr. Walter would have been, then the sale actually would have gone through on July 14th. It's difficult for me to understand how Mr. Walter did not have control over the disposition of the shares, or did not, more specifically, did not acquire a beneficial interest in the shares on July 14th if he was able to sell those on July 14th. In other words, on July 18th, when the actual payment was wired, the settlement was effectuated by Piper Jaffray. That is, as it is in any stock transaction, just simply the amount which occurs after the trade date. There's a couple of other facts that I think haven't really been addressed in the reply brief, and they're also important facts. That's that the plan administrator's determination under the terms of the plan is conclusive and binding on Mr. Walter, and it is clear in this case that the plan administrator determined that the trade occurred on July 14th. Does the plan administrator have a bit of a conflict of interest in that regard, though? Well, I think that the plan administrator's probably obligated to carry out his or her duties in a manner that doesn't violate any fiduciary duties. So, I mean, obviously, the plan administrator has to carry out that in good faith. I'm just wondering, as a matter of law, how much deference we give to that, where there is a potential conflict of interest. Well, there's a potential conflict of interest, but it doesn't look to me, in this case, as if that was in play. In other words, I mean, there's evidence on July 17th. I know counsel for the appellants mentioned that that's three days later, but as a matter of fact, July 14th was 2000, was a Friday. So the very next business day was July 17th. And before the opening of the stock exchange on July 17th, Primus was faxing its confirmation to Piper Jaffray. And so, I mean, there's certainly a chance. Neither party knows at that point that the stock will, in fact, increase in price on the 17th and increase in price on the 18th, so that Primus is actually disadvantaged by treating 7-14 as the trade date. But in fact, at that time, Primus was treating 7-14 as the trade date. I'm more concerned as a legal principle if facts were different to where it looked like a plan administrator was using a date that benefited them to the detriment of the shareholder. One of these clauses about deference, giving deference, essentially, I would have some concern with where you have a conflict of interest in that. I think you're right, Your Honor. I think it would be unconscionable to enforce that clause if there were some evidence that the plan administrator was somehow manipulating things for the benefit of the company. But absent that, it's your view, apply the face value. That's correct. And those facts aren't present in this case. Yes, sir. The option letter agreements, however, do not expressly provide for payment by broker assisted cashless method, do they? They do not, Your Honor. And from that... Well, that's why Walter argues that the plan administrator did not affirmatively exercise a discretion to use the 7.III plan, correct? That's correct, Your Honor. So how do you respond to that? My response is that at the time the options were granted and the time in which they were exercised were over a year apart, there was nothing in the plan that required the option plan administrator to set forth the methods of payment in the option grant agreements themselves. So at any time prior to exercise, the plan administrator had the discretion to approve an alternate mode of payment. And it appears from the facts there's a strong inference that that approval occurred. There was a specific form. Well, first of all, the company designated Piper Jaffray to conduct these broker assisted cashless exercise transactions. There was a form ostensibly designed for that purpose at Piper Jaffray. The company acted in all respects as if this was an approved method of exercise. And from those facts, I think it's quite reasonable for the tax court to have inferred that this was an approved method. Is there anything in the plan, we mentioned the option letter agreements, that requires the plan administrator to expressly approve a section 7.III broker assisted cashless method? No. There's nothing that requires that. Are there any relevant plan documents that forbid its use? No, Your Honor. What does the plan say? With regard to? With regard to that. The methods of payment are essentially left to the discretion of the plan administrator. I mean, right after 7.5 III, there's part IV, which says, or any other payment method approved by the plan administrator. So there's essentially no limit to the universe of payment methods that could be approved by the plan administrator. Thank you. One more point that I think, and it's more of a procedural or technical point, but we haven't talked about the standard of review. I think that, you know, as we argue this case, we're asking, I think the appellants are asking this court to weigh evidence one way or the other, and that's really a factual determination. And so I think in this case, the standard of review is deferential rather than de novo review. But to the tax court? Yes. Isn't application of the law to stipulate facts review de novo? An interpretation of law, an application to a set of facts, to an undisputed set of facts to law is de novo review. But there are disputed facts in this case. The dispute is whether the exercise actually occurred on a particular date. The dispute is whether or not this particular method was approved by the plan administrator. And both parties on appeal are effectively asking this court now to make, draw inferences from those facts. The tax court has a certain level of expertise with these kind of stock transactions. Was it a mixed question then? Could this be categorized as a mixed question? Well, I don't think there's any dispute as to the applicable law. I think when counsel with appellants stood up here and said that there was really no dispute that the legal principle, which is that the beneficial interest occurred on a particular date, there was no dispute that that occurred on the date of exercise. The question is, what is the date of exercise? And there is, and that is a question of fact. That varies by case. And as I mentioned, the tax court does deal with some of these cases where there's a trade date and a settlement date. The trade date is what fixes, for example, the holding period for long-term versus short-term capital gains and so forth. So the tax court does have a certain level of expertise with that and is entitled to that level of deference. Well, the reason that I ask you before the tax court is not because I'm worried, as I understood the tax court opinion, this is a decision without trial, and therefore, it seems to me, as I understood it, nothing more than a summary judgment decision. A decision without trial is not a summary judgment decision procedurally. It is essentially a submission of documentary evidence with no testimony. We thank you for the argument. And we'll move to the rebuttal. Ms. Jaffe? Yes, Your Honors. I would like just to make a couple of quick points. First of all, there was a conflict of interest. Primus was able to get a compensation deduction of approximately $600,000 more than it would have gotten otherwise with not paying anything out of its pocket by using July 14th. In addition, the plan itself, in terms of what needs to be done to authorize an additional method of payment, the plan itself says that it is in the discretion of the plan administrator either at the time the options are granted or at any time before exercise. And it would seem to me that a discretionary action by the plan administrator, particularly where we do have the plan administrator adopting additional methods of payment formally in writing, we would have something in writing that it wouldn't be as informal as what Papelli seems to be implying here, that Primus just decided to adopt additional methods of payment. So I would like just to make a couple of quick points. First of all, there was a  $600,000 more than it would have gotten otherwise with not paying anything out of its pocket by using July 14th. And it would seem to me that a discretionary action by the plan administrator,  in that case, Primus would have received payment in full on that date, because there would have been cash. No, actually, they wouldn't, because settlement date comes sometimes later. But it would have been, yeah. I'm not considering that. You're not telling us something we haven't already heard. You're really drawing a different inference as to whether he had control. Right. I'm not saying the settlement date controls. I'm just saying, in other words, if he had issued the check on the 18th and it didn't get there until the 19th and they didn't purchase the stock until the 20th, the settlement date was the 20th. So we're just arguing the date of the payment is the controlling date. Okay. Thank you for the argument. Thank both counsel. The case just argued is submitted. Next case on the calendar is also submitted on the briefs. That's the United States v. Cerrone and the United States v. Jones.
judges: Clifton, Smith, Seabright